Filed 5/13/24  Matthes v. Rodgers CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTIN MATTHES, | B322759 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC702531) |
| v. | |
| LYNDSY RODGERS, et al., | |
| Defendants and Appellants. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Holly Fujie, Judge.  Affirmed.

Kaedian, Katherine C. McBroom, Henry L. Whitehead for Defendants and Appellants.

RMO, Sean D. Muntz for Plaintiff and Respondent.

Respondent Christin Matthes was an au pair for appellants Christian Rodgers and Lyndsy Rodgers.[1]  On respondent's last day with the Rodgers family, Christian attempted to film her while she was showering.  In addition to pressing criminal charges against Christian, respondent pursued civil claims against both appellants.  The jury found for respondent on several causes of action and awarded her $650,000 in compensatory damages, with Christian liable for $450,000 and Lyndsy liable for $200,000.  The jury also awarded punitive damages, which respondent agreed to remit to $1.8 million against Christian and $200,000 against Lyndsy.

Appellants contend the judgment should be reversed because the trial court improperly instructed the jury on negligence, employer negligence, and punitive damages.  They further argue that the punitive damages award against Lyndsy and certain of the verdicts are not supported by substantial evidence, the general verdict form was ambiguous and allowed the jury to award respondent duplicative damages, and the compensatory and punitive damages were excessive. We affirm the judgment and order denying appellants' motion for judgment notwithstanding the verdict.

## FACTUAL BACKGROUND

Respondent is a native of Germany. She attended school there and received training in pediatric nursing and healthcare management. To combine her interest in working with children and her desires to live abroad and experience another culture, respondent decided in late 2016 to become an au pair.  Through an agency, respondent applied to be an au pair in the United

---

[1]      When we refer to appellants individually, we use their first names to avoid confusion.  No disrespect is intended.

States. She interviewed with five or six families before deciding to work with appellants, about whom she "really had a good feeling" and thought "were a great fit." Lyndsy similarly testified that she "got a good vibe" from respondent and "liked her in our interviews."

Respondent began working with appellants in March 2017, when she was 23. Respondent understood appellants to be her employers. She cared for their three young children—twin premature infants and a toddler—and did other light household tasks for 45 hours per week. Appellants paid her weekly and provided her with room and board in their home. Respondent testified that she "got along really well" with Lyndsy, who she said "was taking care of me and really helped me out while I was there." Lyndsy agreed with this characterization, testifying that she and respondent "got close" while Lyndsy was on parental leave and that respondent confided in her about the recent death of respondent's boyfriend. Respondent got on less well with Christian, which she attributed to their "different view[s] on different things" and what she viewed as his tendency to treat her as "just the staff and not a family member." Lyndsy testified that she frequently "ran interference" between Christian and respondent.

In October 2017, respondent decided to leave appellants' home to "rematch" with a different family. Her last day with appellants was November 8, 2017. Respondent described that day as a "regular day of working," after which she went to a hip-hop dance class. When she got home from the class, respondent went upstairs to take a shower in the bathroom adjoining her bedroom. The bathroom had an uncovered window that faced the backyard.

Christian was in the backyard at the time. He had been drinking. He testified that he heard respondent come home, then saw the lights go on in her bedroom and bathroom. Using gardening wire, Christian attached his phone to the metal blade of a tree-trimming pole. He hit the "record" button and hoisted the pole up toward the window, but the phone fell off. Christian testified that he reattached the phone, pressed record again, and lifted the pole up again. He stated that "either it was that time or possibly a third time before Miss Matthes saw the phone in the window."

Respondent testified that she had been in the shower for about two minutes when she noticed something moving outside the bathroom window: a phone affixed to a pole by green wire. Respondent "immediately screamed," "extremely loud." Respondent testified that "the phone dropped," leading her to conclude "the person out there definitely heard my scream, because it was like in a reaction." Indeed, Christian testified that he heard a "loud" scream that made him feel "like I just got hit by a car." In deposition testimony read to the jury, Christian described the scream as "like it was on top of me." At trial, he explained, "I was not expecting this. And it was loud; it was sobering. It was like . . . what was that? Like, what was I doing?" He said the scream "woke me up out of my sort of stupidity." Christian lowered the pole and removed the phone. He saw "two or three" thumbnails indicating that the phone had recorded something during the incident. He deleted the files without opening them and went inside the house. He walked up the stairs loudly because he expected Lyndsy and respondent to be there waiting for him and thought he "was going to be in some serious hurt."

4

No one was waiting for Christian. Lyndsy testified that she was sleeping and did not hear the incident or the aftermath. Respondent testified that after she screamed, she "jumped out of the bathtub and grabbed my towel and sat on my bed, and I literally was just shaking. And I wasn't sure what's going on right now." She added, "everything was just running through my mind. Like, are there other cameras in my room? Is there, like, a stalker? Do they have multiple videos of me? That was extremely intense."

While she was still sitting on the bed, respondent heard the "main door" to the house open. She testified "that was actually the moment I realized that this has got to be Christian Rodgers filming me, because it was the reaction of my scream." Respondent testified that she "got really nervous, because I realized him being in the house, knowing that I saw him filming me is something that can, like, split a family in a way of destroying his life. So I actually got really scared that he's coming into my room, may even threaten me or hurt me because of the info I now have of him."[2] Respondent heard Christian walk up the stairs and up and down the hallway; she said it sounded "like he was nervous," which in turn "got me even more nervous, because I had no clue what he was capable of right now." Feeling "a little bit helpless," respondent looked for an item to defend herself with—she found only a pen—and barricaded her bedroom door with moving boxes. She called the emergency number at the au pair agency, and then called her mother in Germany, with whom she stayed on the phone much of the night. Respondent

---

[2] On cross-examination, respondent acknowledged that Christian had never previously threatened her or been physically aggressive with her.

5

did not call 911 because she had already called the emergency number at the au pair agency, knew she would be leaving appellants' house in the morning anyway, and "did not want to cause any more action."

Christian testified that he could hear respondent talking on the phone in German while he was outside her room. He decided against knocking on her door—"she would have said I was trying to go get her or something"—and instead went into his room across the hall, expecting to find Lyndsy awake. Christian testified that he did not think respondent was afraid at this point, because "I thought that if she was afraid, that she would have gotten the kids, the babies, and made sure they were safe," as "they were sort of her charge." In response to a question on cross-examination about whether respondent "was still working for you" on November 8, 2017, Lyndsy similarly stated, "Yes, she was still our au pair" and acknowledged that respondent was "still in the room that was provided to her in [the] home."

Respondent sent Lyndsy a text message around the time of the incident; the time stamp on the text is 21:44, or 9:44 p.m. Respondent testified, "After my scream, I actually was 100 percent sure that she had wakened up [*sic*]. So I texted her that this scream was my scream and that the incident happened; that someone's filming me or filmed me while I was showering." The text message, which was the first in a series admitted into evidence at trial, stated, "I do Not know what is going on here i am shaking and someone just filmed me while i wanted to shower. This is not a joke. The phone was fixed on something like a stick. This is crazy and this is real. I am 100 procent [*sic*] sure." Respondent said she hoped that Lyndsy, who said she

6

slept with her phone near her nightstand, would read the text and "realize that something's going on here right now."

Lyndsy, who repeatedly testified that she "did not hear a scream,"[3] responded to the text message at 5:56 the following morning, November 9. Her response stated, "Hi I'm sorry I was asleep already and did not get the text. That is horrible I'm so sorry. Let's talk today, maybe we should file a police report." At 6:50 a.m., respondent answered, "Also this Person knew when i started the shower." Respondent explained that she was trying to convey to Lyndsy that she suspected Christian, but "thought it might be hurtful" to say that to Lyndsy directly. However, the au pair agency contacted Lyndsy and informed her of the incident and respondent's suspicions about Christian's involvement. Lyndsy testified that her response was, "No way. That's crazy." Lyndsy told Christian to give her his phones[4] so she could give them to respondent to examine. Lyndsy explained that she thought respondent "could scroll through them and feel better about it, you know, feel better that there's nothing on there." Lyndsy added, "my thought was, if he did it and there's photos on there, then she's going to find it, and that would be my thought, because it's like, it's crazy. Like, there's no way." Lyndsy slid the phones under the door to respondent's room and texted her the passcode to open them at 7:11 a.m. Respondent testified that she interpreted this gesture as Lyndsy "trying to convince me that it

---

[3] Lyndsy also testified, however, that she and Christian "would wake up because the babies would wake up," usually around 5:00 a.m., and that she knew the babies were awake because "I would hear them."

[4] Christian had two cell phones at the time: a personal phone and a work phone.

7

wasn't" Christian and "trying to defend him."  Respondent thought Lyndsy "was extremely worried and nervous."

Respondent told Lyndsy that looking at the phones was "not really useful," because "the person that was in front of the bathroom obviously heard my scream" and "would just delete those photos right afterwards."  Respondent did not find any photos or videos on the phones.  However, she looked out the window and saw the green wire that had been used to tie the phone to the pole lying on a table in the backyard.  Respondent took this as "another proof in my mind that this has got to be Christian Rodgers" and told Lyndsy about the wire.  Respondent testified that Lyndsy's reaction "was that it's even more crazy that obviously someone from the neighborhood or somewhere else is jumping in their backyard and using their stuff."  Lyndsy testified that after Christian left for work, she encouraged respondent to search through the rest of the yard, the garage, the car, and even appellants' bedroom.  Lyndsy said that she wanted respondent to search the house because "it made zero sense to me that [Christian] would have done anything like that."  Respondent testified that Lyndsy did not limit her search, and seemed "really concerned about the situation and wanted to know what's going on, yes. So I think she was honest, too."  Christian testified that he believed Lyndsy "didn't really think that I did it."

Lyndsy testified that Christian had been "frustrated" and "kind of pouty" that morning before he left for work, which she interpreted as anger at being falsely accused.  However, at 7:29 a.m., Christian sent respondent a text message stating, "FU"; he testified that he "meant the word that we all know that it means."  Lyndsy testified that Christian showed her the message,

which made her "furious" because she "couldn't believe you did that." Respondent testified that the message made her "extremely angry," as did Christian's follow-up text stating, "Sorry, I'm upset. I wish you would have told us right away if something was wrong." Respondent testified that she thought Christian sent the follow-up text "for his own benefit," to "get clear with the family and wants to calm me down" so she would not go to the police.

Lyndsy testified that later that day, after respondent had moved out, she wondered, "How am I going to convince her it wasn't him?" Lyndsy purchased software to search Christian's phones, with the plan to "convince [respondent] that there was nothing there, and that [Christian] hadn't done this." However, when Christian came home, he told Lyndsy that he had attempted to film respondent. Lyndsy testified that she was "shocked" by the news, which was "difficult" for her to process. She also said that she "felt empathy" for Christian because she "felt like [he] was sorry."

Appellants discussed what to do next. Lyndsy wanted them to call respondent jointly "and talk to her about it." Lyndsy explained that she "wanted to be a part of that conversation" for several reasons, including, "I felt like it was my apology, too"; Christian was not "great at communicating heavy things" and she "wanted it to come across correctly"; and she did not want him "to leave anything out." In his deposition, Christian said Lyndsy went into "lawyer mode"[5] about the proposed call. During

---

[5] Lyndsy testified that she was a private practice attorney in the field of education law. She and Christian represented themselves at trial, though Lyndsy testified that she had no litigation experience.

trial, he testified that Lyndsy "thought it was a better idea to do it via phone" because "it wasn't smart to put it into writing."

Lyndsy testified that Christian nevertheless "went rogue" and failed to "respect my part in this, too" by sending respondent an apology text message on November 10, 2017. Lyndsy testified that she was "furious." She explained that she felt Christian was "still off trying to do stuff on your own" and "hadn't figured out that . . . this was impacting me, too." She added, "I'm in this too, buddy."[6]

Christian read the apology text message into the record when he took the stand for the defense. In it, he apologized and accepted responsibility for his "lack of judgment." He also told respondent that he wanted her "to know that I do not have nor have I seen any video of you. Anything that I may have had, anything I may have had of you from Wednesday I deleted when I heard you scream. Your scream scared me. It made me feel how bad this was. I've never heard a scream like that. It didn't sound like you. It sounded like you were terrified. . . . Your scream made me aware that this was terrifying for you. I will never forget the sound of your scream. So I deleted everything before I went into the house. . . . I know I can't make up for what I put you through, but I want to make sure you know that there is no video. You're not imagining things, and I'm sorry for all the pain that I caused you."

---

[6] Lyndsy also testified, however, that she was "trying to limit the time that I'm involved" in the lawsuit, both because it "does not involve me, in my opinion," and for health reasons. She added that she would be present when the court needed her and "will absolutely be here and support my husband."

The following day, on November 11, 2017, Lyndsy sent respondent an apology text of her own. It stated in part, "I don't even know what to say. I'm so sorry I believed Chris and defended him. I'm disgusted." Respondent sent a lengthy response, in which she stated in part, "I knew it was him. His message was no Surprise. I had that inner feeling that was so sure. . . . That's why i did not move out of my room. I suddenly had no idea whatever the hell he is able to do and i knew now something that will destroy his whole life. I was Thinking 'what? I should have run into chris' arms and ask him to help me from that man filming me taking a shower?' You really did Not hear my scream? I am wondered whether your mind was 'playing tricks on you' to safe yourself. Because as chris also said this was not just simple scream." In her response back, Lyndsy said Christian "was ashamed of doing it, of lying to me, of causing so much pain and he wanted you to know that you were right and that he had lied. He was ashamed of all of it and he will live with that shame and the consequences." She also stated, "And I really did not hear you scream. God I wish I would've—that makes no sense to me. I never woke up."

Respondent took Christian's apology text message to the police and pressed charges against him. Christian was convicted of attempted invasion of privacy. When asked by her counsel if that is how she would describe the events of November 8, 2017, respondent said, "Not at all. I think it was much more." She further explained, "It was not an attempt. It was that he invaded my privacy. And also, like I said, I feel sexually harassed. And this was much more . . . of a bigger deal of how I felt, and I feel this is not describing the situation, the result how I at least felt in the end." She added, "I feel just like he definitely crossed my

11

personal border," and "I wasn't even able to do something about it." In response to a question from counsel, respondent said she did not think Christian would have videotaped her in the shower if she were a man.

Respondent further testified that after she moved in with her next family, she "realized that I still have some difficulties." The incident "was on my mind the whole time" and she "had also struggles to sleep." Respondent was also anxious because the home "was not far away from the Rodgers' home," and she feared that Christian would "figure out the new address and come to the new place." The new family recommended she see a therapist, which respondent did; she had never seen one before, even after her boyfriend unexpectedly died. Respondent testified that even at the time of trial, she remained concerned that there may have been other incidents[7] and that videos of her could be "on the internet or anywhere else." She explained that her continuing concern was due in part to Lyndsy's representation that she had not found any deleted videos on Christian's phones even though Christian had said he deleted videos; this made her think "that

---

[7] Respondent's counsel asked her, "when you look back at your time with the Rodgers, was there another event that you look at, and you're kind of questioning what Mr. Rodgers' intentions were?" Respondent related an incident in which Christian volunteered to take photos of her, which she thought was "really nice," because she wanted to try to get cast as an extra in a movie. She explained, "My first thought was, that's actually really nice from him. And then he mentioned not to tell Lyndsy. And I was like, 'Why? Why should I not tell about Lyndsy [sic] you taking pictures of me?' And that's when I was confused about him asking me that." There was no further testimony about this incident.

he got rid of them when he found them on the phone," and "I don't know what happened to them or may happen or what she saw there or may go there."

Respondent testified that the incident "still really has a big impact on my life." She said that when "people ask me about the time I had in America, it's hard to just say it was great. . . . I see myself sometimes still getting upset about the incident, and then I have some, like, what I would consider being down for – for a couple of days." She further testified that she still struggled when bathing "in new places."

## PROCEDURAL HISTORY

On April 18, 2018, respondent filed a complaint asserting 13 causes of action against appellants. For reasons unclear from the appellate record, only six causes of action proceeded to trial in April 2022: invasion of privacy against Christian; constructive invasion of privacy against Christian; assault against Christian; negligent infliction of emotional distress (NIED) against appellants; intentional infliction of emotional distress (IIED) against appellants; and sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940) against appellants. Respondent sought compensatory and punitive damages.

Using a verdict form prepared by respondent's counsel and not objected to by appellants, the jury returned a mixed verdict. It unanimously ruled in favor of Christian on the causes of action for invasion of privacy, assault, and NIED, and in favor of Lyndsy on the cause of action for IIED. The jury unanimously ruled in respondent's favor on the other causes of action. On the claim for constructive invasion of privacy, it found Christian liable for $100,000 in damages. On the claim for NIED, it found Lyndsy

13

liable for $100,000 in damages.  On the claim for IIED, it found Christian liable for $250,000 in damages. And on the FEHA claim, it found appellants each liable for $100,000 in damages. The jury also found, by a vote of 10-2, that appellants each "engaged in the conduct above with malice, oppression, or fraud" and awarded respondent $2,000,000 in punitive damages against Christian and $1,000,000 against Lyndsy.  The trial court entered judgment on June 6, 2022.  Under that judgment, Christian was liable for $450,000 in compensatory damages and $2,000,000 in punitive damages, and Lyndsy was liable for $200,000 in compensatory damages and $1,000,000 in punitive damages.

On July 1, 2022, appellants, through counsel, filed motions for judgment notwithstanding the verdict (JNOV) and for new trial.  In these substantively similar motions, appellants raised the arguments they now assert in this appeal.  Respondent opposed both motions.

The trial court heard and denied both motions on August 11, 2022.  The denial of the motion for new trial was conditioned on respondent's consent to a reduction in punitive damages as to both appellants; the court found that the punitive damages were excessive as to Christian "due to the disparity between the amount of damages awarded against him and the actual harm he caused plaintiff," and were excessive as to Lyndsy because they "were at a higher multiplier than those issued against Mr. Rodgers, despite their differing levels of overall liability" and Lyndsy's conduct "did not evince the same level of reprehensibility or pose as significant a danger" as Christian's "initial act."  Respondent consented to reduce the punitive damages against Christian to $1,800,000 and the punitive damages against Lyndsy to $200,000.

14

Appellants timely appealed from the remitted judgment and order denying their JNOV motion.

## DISCUSSION

### I. Jury Instructions

Appellants contend that the court erroneously instructed the jury on duty, the concept of "special relationship" in the context of duty, and punitive damages. We find no prejudicial error.

#### A. Duty & Special Relationship

##### 1. Background

The court instructed the jury with a modified version of CACI No. 1620, which sets forth the elements of a negligence claim that results in emotional distress. The pattern instruction lists three elements that the plaintiff must prove: (1) that the defendant was negligent; (2) that the plaintiff suffered serious emotional distress; and (3) that the defendant's negligence was a substantial factor in causing the plaintiff's serious emotional distress. For reasons unclear from the record, respondent's counsel added the following language to the first element of the pattern instruction: "i. To establish that Defendants were negligent, Christin Matthes must prove all of the following: 1. That Defendants owed Christin Matthes a duty of care; 2. That Defendants breached their duty of care; and 3. That Defendants' breach caused Christin Matthes harm."

Respondent's Special Instruction No. 3, "Employer Negligence—Recovery of Damages for Emotional Distress," which we discuss more fully below, similarly directed the jury that respondent had to prove that appellants owed her a duty of care, that they breached that duty, and that the breach caused her harm. It further provided that to find that Christian had a duty

15

of care, the jury had to find that he had a special relationship with respondent—and to find *that*, the jury "should consider that the typical setting for the recognition of a special relationship is where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." Similarly, it provided that to find that Lyndsy owed respondent a duty of care, the jury had to find that Lyndsy had a special relationship with Christian. To make that finding, the jury was directed to consider Lyndsy's ability to control Christian and the foreseeability of Christian's conduct.

Appellants challenged these instructions in their post-trial motions on the same grounds they raise here. The trial court rejected their arguments. It ruled that although duty is a question of law for the court, the evidence supported the negligence claims as they were described in the instructions.

### 2. Analysis

Appellants reiterate their contentions that these instructions were erroneous because the existence of a duty is a legal question for the court, not a factual question for the jury. They further contend that Special Instruction No. 3 was a "gross misstatement and oversimplification of the special relationship doctrine," and the evidence did not support a finding that Lyndsy owed respondent a duty of care or had a special relationship with Christian.[8] They request that we "find that the trial court erroneously directed the jury to determine whether Ms. Rodgers owed Respondent a duty of care, evaluate the issue *de novo*, and reverse the judgment given the lack of evidence that Ms. Rodgers owed a duty of care to Respondent." Respondent contends that

---

[8]     Appellants do not dispute that Christian owed respondent a duty of care.

16

appellants cannot demonstrate prejudice or a miscarriage of justice resulting from any error, as substantial evidence supports a finding of duty and special relationship.[9]  We agree with respondent.

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209 (*Brown*).)  A duty exists only where a plaintiff's interests are entitled to legal protection against a defendant's conduct.  (*Id.* at p. 213.)  Whether this standard is satisfied is a question of law for the court.  (*Ibid.*)  The trial court thus erred in allowing the jury to consider whether appellants owed respondent a duty of care.  However, this does not end our inquiry, as "an appellant must demonstrate that any alleged error in the jury instructions was prejudicial, i.e., that it was probable that the appellant would have achieved a more favorable result without the error." (*Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1055.)

The general rule of duty in California is broad.  (*Brown*, *supra*, 11 Cal.5th at p. 214.)  Under Civil Code section 1714, subdivision (a), "[e]veryone is responsible, not only for the result

_____

9       Respondent also contends that appellants forfeited any challenge to the jury instructions by stipulating to them at trial. We decline to find a forfeiture here.  (See *Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 7 ["A party may, however, challenge on appeal an erroneous instruction without objecting at trial."]; *Alaniz v. Sun Pacific Shippers, L.P.* (2020) 48 Cal.App.5th 332, 339 ["the failure to request correct instructions does not forfeit a challenge to jury instructions that erroneously contain legal standards inapplicable to the facts"].)

of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person. . . ."  (Civ. Code, § 1714, subd. (a).)  However, this provision imposes a general duty of care on a defendant "only when it is the defendant who has '"created a risk"' of harm to the plaintiff, including when '"the defendant is responsible for making the plaintiff's position worse."'"  (*Brown*, *supra*, 11 Cal.5th at p. 214.)  In contrast, a person who did not create a peril generally is not liable in tort for failing to affirmatively assist or protect another from that peril.  (*Ibid.*)  There are "a number of exceptions" to these general principles.  (*Id.* at p. 215.)  For instance, if a person chooses to come to the aid of another, "she may then have an affirmative duty to exercise reasonable care in that undertaking."  (*Ibid.*)  A person also may have an affirmative duty to protect a victim of another's harm "if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm.'"  (*Ibid.*)

"A special relationship between the defendant and the victim is one that 'gives the victim the right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct."  (*Brown*, *supra*, 11 Cal.5th at p. 216.)  A special relationship "puts the defendant in a unique position to protect the plaintiff from injury," and "[t]he law requires the defendant to use this position accordingly."  (*Ibid.*)  Whether such a relationship exists is a question of law.  (*Russell v. Department of Corrections and Rehabilitation* (2021) 72 Cal.App.5th 916, 934.)  In resolving this question, the court "considers whether the parties have a special relationship by

18

considering the particular facts and circumstances of their association with one another." (*Brown*, *supra*, 11 Cal.5th at p. 221.) "'[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." [Citations.]'" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 621 (*Regents*).) If a court determines that a special relationship exists, it must then "consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 (*Rowland*)] to determine whether relevant policy considerations counsel limiting that duty." (*Brown*, *supra*, 11 Cal.5th at p. 209.) Those factors include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, *supra*, 69 Cal.2d at pp. 112-113.)

Here, it is not reasonably probable that the result would have been different had the jury not been instructed to determine the existence of a duty and special relationship and the court had made the determination instead. "We start by identifying the allegedly negligent conduct by [defendants] because our analysis is limited to 'the specific action the plaintiff claims the particular [defendants] had a duty to undertake in the particular case.'" (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62.) Here, respondent argued during closing that

Lyndsy heard her scream and acted to protect Christian by feigning sleep and later dismissing respondent's concerns instead of investigating the scream, calling law enforcement, or crediting respondent's suspicions that Christian was responsible. As the trial court put it when denying the post-trial motions, respondent "identifies the duty Ms. Rodgers owes to Plaintiff as a duty to protect against harm from Mr. Rodgers's actions due to her status as his wife and Plaintiff's co-host and employer."

The particular facts and circumstances of this case support the existence of such a duty as a matter of law. It was undisputed that respondent was a young foreigner who was living in appellants' home and was dependent on them for room, board, and her earnings. She was particularly vulnerable, and appellants had substantial control over her welfare. Accordingly, there was a special relationship between appellants and respondent. Where, as here, a case involves harm caused by a third party (Christian), a special relationship can arise with "either the victim *or* the person who created the harm." (*Brown*, *supra*, 11 Cal.5th at p. 215, emphasis added.) We therefore do not reach appellants' arguments regarding Lyndsy's special relationship with Christian; Lyndsy had a duty to respondent regardless, due to the special relationship between her and respondent.

In light of our conclusion that Lyndsy owed a duty to respondent, we must next "consult the factors described in *Rowland* to determine whether relevant policy considerations counsel limiting that duty." (*Brown*, *supra*, 11 Cal.5th at p. 209.) "The *Rowland* factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second

20

embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability." (*Regents*, *supra*, 4 Cal.5th at p. 629.) The foreseeability factors "are assessed based on information available during the time of the alleged negligence," while the policy factors are forward-looking. (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1022 (*Kuciemba*).) Our "inquiry hinges not on mere rote application of these separate so-called *Rowland* factors, but instead on a comprehensive look at the "'sum total'" of the policy considerations at play in the context before us." (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 399.) Here, the *Rowland* factors collectively do not warrant limitation of the duty flowing from the special relationship between Lyndsy and respondent.

The key consideration among the foreseeability factors is whether the injury in question was foreseeable. (*Kuciemba*, *supra*, 14 Cal.5th at p. 1022.) We focus "not on particularities of the defendant's conduct and the plaintiff's injury, but on 'whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed. . . .'" (*Ibid.*) The question thus is whether it was foreseeable that an au pair's host's negligent failure to protect the au pair from tortious (and criminal) conduct could result in emotional distress to the au pair.[10] We conclude that it was. The second factor, "the degree of certainty that the plaintiff suffered injury" (*Rowland*, *supra*, 69 Cal.2d at p. 113), is relevant and cuts against finding a duty because emotional

---

[10] In their briefing, appellants assert that the question is whether Christian's conduct during the recording incident was foreseeable.

21

distress is intangible and therefore uncertain.  (*Kuciemba*, *supra*, 14 Cal.5th at p. 1023; see *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1085 (*Vasilenko*).)  The third factor, the closeness between the defendant's conduct and the injury (*Rowland*, *supra*, 69 Cal.2d at p. 113), is strongly related to the question of foreseeability but also accounts for third-party or other intervening conduct.  (*Vasilenko*, *supra*, 3 Cal.5th at p. 1086.)  Here, the injury directly flows from Lyndsy's failure to protect respondent, both from Christian's initial conduct and from the aftermath.  This factor accordingly cuts in favor of finding a duty.

The foreseeability factors generally weigh in favor of recognizing a duty.  But a "'duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injury so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'"  (*Kuciemba*, *supra*, 14 Cal.5th at p. 1025.)  The policy factors address this concern.  The first, the moral blame attached to the defendant's conduct (*Rowland*, *supra*, 69 Cal.2d at p. 113), tips in favor of finding a duty where the defendant failed to take reasonable ameliorative steps to avert the foreseeable harm.  (*Kuciemba*, *supra*, 14 Cal.5th at p. 1025, citing *Vasilenko*, *supra*, 3 Cal.5th at p. 1091.)  Moral blame also may be present where "'the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue.'"  (*Id.* at p. 1026.)  Here, Lyndsy failed to take reasonable steps to avert respondent's emotional distress, and also occupied a position of power over respondent.  The moral blame factor weighs in favor of a duty.  So too does the next policy

22

factor, prevention of future harm (*Rowland*, *supra*, 69 Cal.2d at p. 113). This factor "examines both the positive and negative societal consequences of recognizing a tort duty" (*Kuciemba*, *supra*, 14 Cal.5th at p. 1026); here, and generally, the former outweigh the latter in the context of au pairs and their hosts. As respondent notes, imposing a duty "will provide more accountability for damage that household/domestic help suffer due to their host family's wrongful conduct." The next policy factor, "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach" (*Rowland*, *supra*, 69 Cal.2d at p. 113), plainly cuts in favor of imposing a duty here. The cost to defendants of upholding, not violating, the duty of ordinary care is minimal in this context. The final *Rowland* factor, "the availability, cost, and prevalence of insurance for the risk involved" (*ibid.*) is difficult to analyze as the record contains no information about the insurance available to homeowners who host au pairs. We thus find this factor neutral.

On balance, the *Rowland* factors favor imposition of a duty here. In the narrow circumstances in which it applies, the duty would prevent au pair hosts from turning a blind eye to tortious conduct suffered by their au pairs. Although the duty may impose some burdens on au pair hosts, we are not persuaded that they would be so great as to overcome the benefit to au pairs. This is essentially the same conclusion the jury reached. We accordingly discern no prejudicial error in the duty or special relationship instructions.

**B.     Punitive Damages**

**1.     Background**

After the close of evidence, the trial court instructed the jury with CACI No. 3940, "Punitive Damages—Individual Defendant—Trial Not Bifurcated."  As relevant here, it states that the jury "should consider" certain factors "in determining the amount" of punitive damages, including "In view of [*name of defendant*]'s financial condition, what amount is necessary to punish [him/her/*nonbinary pronoun*/it] and discourage future wrongful conduct?  You may not increase the punitive award above an amount that is otherwise appropriate merely because [*name of defendant*] has substantial financial resources.  [Any award you impose may not exceed [*name of defendant*]'s ability to pay.]"

Prior to closing argument, respondent's counsel notified the court that there was "an issue" with the instruction: the portion quoted above was "excused" in this case.  Counsel informed the court that respondent had "issued six notices to appear and produce to Mr. and Mrs. Rodgers, for them to produce financial documents and documents relating to punitive damages.  The law on this issue is that when a defendant fails to comply with a properly issued notice to appear and produce, that the plaintiff is excused from presenting evidence."  Counsel cited *Morgan v. Davidson* (2018) 29 Cal.App.5th 540, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*Morgan*) in support of the position.

In response to queries from the court, Christian admitted that he and Lyndsy had received notices to appear and produce documents "like frequently" but he did not bring any documents

24

to court with him.[11]  He asked if he needed to get "bank statements or something," or have Lyndsy "send something."  The court responded that it was the fourth day of trial and evidence was closed.  After further colloquy, Christian stated, "They did ask for it. I just -- I didn't know, and I didn't think, and I wasn't doing it right.  And so luckily they brought it up today, and now we can take that out of the jury instructions."

After reviewing *Morgan* in chambers, and finding that Christian received and reviewed the requests for production, the court stated that it would remove the language regarding financial condition from the instruction and re-instruct the jury on punitive damages.  The court told the jury that it would "withdraw the previous instruction on punitive damages and read you a new one," which it did.  The new instruction tracked CACI No. 3940 but omitted the language directing the jury to consider appellants' financial condition when imposing punitive damages.  The jury found that appellants both acted with "malice, oppression, or fraud," and imposed $2,000,000 in punitive damages against Christian and $1,000,000 against Lyndsy.

Appellants challenged the punitive damages instruction and verdict in their post-trial motions.  They attached declarations asserting that the verdicts would "financially ruin our family" because they had no assets other than their cars and had substantial expenses and liabilities.  Christian further asserted that he "did not willfully fail to comply with the Notices to Appear and Produce Documents," and he "would have produced the requested documents in Court" had respondent

---

[11]     It does not appear that Lyndsy was present during this discussion or other proceedings that day.

25

"raised the issue before trial or at any point before the close of evidence."

The trial court ruled that the punitive damages instruction was not erroneous. It found "there was a sufficient basis for the award of punitive damages against both" appellants, and that appellants "have not meaningfully distinguished" *Morgan*. However, the court agreed with appellants that the punitive damages were excessive. Respondent agreed to remit the awards to $1,800,000 against Christian and $200,000 against Lyndsy.

## 2. Legal Principles

"The purposes of punitive damages are to punish a defendant for the conduct that harmed the plaintiff and deter commission of future wrongful acts." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 191 (*Soto*).) "In order for the jury (and the reviewing court) to ascertain whether a punitive damages award is properly calibrated so as to inflict economic pain without financially ruining the defendant, it needs some evidence about the defendant's financial condition and ability to pay the award." (*Id.* at p. 192.) To that end, our Supreme Court has held that "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109 (*Adams*).) The plaintiff bears the burden of ensuring the record contains such evidence. (*Soto*, *supra*, 239 Cal.App.4th at p. 192.)

However, a "defendant's records may be the only source of information regarding its financial condition." (*Soto*, *supra*, 239 Cal.App.4th at p. 192.) Civil Code section 3295 sets forth various procedures by which a plaintiff may obtain financial records and other relevant information from a defendant. (See Civ. Code,

26

§ 3295; *Soto*, *supra*, 239 Cal.App.4th at p. 193.)  One method enables the plaintiff to "subpoena documents or witnesses to be available at the trial for the purpose of establishing the profits or financial condition . . ., and the defendant may be required to identify documents in the defendant's possession which are relevant and admissible for that purpose and the witnesses . . . related to the defendant who would be most competent to testify to those facts."  (Civ. Code, § 3295, subd. (c).)  "It is the province of the trial court to ensure that both parties comply with the letter and spirit of these discovery [procedures]."  (*Soto*, *supra*, 239 Cal.App.4th at p. 193.)  The consequences for failure to do so on either side "can be dire."  (*Id.* at p. 194.)  Plaintiffs who do not diligently seek discovery or raise the issue "may fatally undermine an otherwise valid claim for punitive damages," while defendants who prevent plaintiffs from meeting their evidentiary burden by failing to comply with discovery obligations or orders may remain subject to an unsupported award.  (*Ibid.*)

"Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages."  (*Soto*, *supra*, 239 Cal.App.4th at p. 195, citing *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 607 (*Mike Davidov*).)  "[T]here is no one particular type of financial evidence a plaintiff must introduce to satisfy its burden of demonstrating the defendant's financial condition."  (*Id.* at p. 194.)  Some evidence of a defendant's actual wealth at the time of trial is necessary, "but the precise character of that evidence may vary with the facts of each case."  (*Id.* at pp. 194-195.)  We review the record for substantial evidence of financial condition.  (*Id.* at p. 195.)  If the record is devoid of such evidence and plaintiff had "a full and fair opportunity to make the requisite showing," the proper remedy is to reverse the award.  (*Ibid.*)

### 3. Analysis

Appellants contend that "*Morgan* is distinguishable from this case and does not provide authority for modification and reinstruction of the standard CACI punitive damages instruction." They also argue that even if respondent was relieved of her burden to present evidence of their financial condition, "the jury still should have been instructed to consider Appellants' financial situation when evaluating punitive damages."

*Morgan* illustrates the principle that failure to comply with discovery obligations relating to financial records can backfire on defendants. In *Morgan*, the liability and punitive damages phases of trial were bifurcated. After finding that the defendants acted with malice and oppression, the court scheduled an order to show cause regarding the defendant's financial condition. Plaintiff's counsel represented that he had served defense counsel with a request to produce documents and bring them to court, but no documents were produced. Defense counsel asserted that the request was untimely, and that the defendant had no assets in any event. Plaintiff's counsel responded that he had sent two notices, the first of which was timely but lacked proper citations, a defect the second remedied. He further argued that any objection to the notices was forfeited. (*Morgan, supra,* 29 Cal.App.5th at pp. 550-551.) The court ultimately awarded plaintiff $100,000 in punitive damages. (*Id.* at p. 546.)

On appeal, the defendant argued that the award was not supported by substantial evidence because the plaintiff failed to produce evidence of the defendant's net worth. (*Morgan, supra,* 29 Cal.App.5th at p. 551.) Relying on authorities including *Soto, supra,* 239 Cal.App.4th at p. 194 and *Mike Davidov, supra,* 78 Cal.App.4th at p. 610, the court rejected the argument. It concluded that the trial court could have credited plaintiff's

28

counsel's representations about the notices and the defendant's failure to comply with them. Under such a scenario, it concluded that plaintiff's "failure to produce evidence is excused because [defendant] did not comply with her discovery obligations." It therefore was "not persuaded" that the plaintiff failed to meet his burden of proof. (*Morgan*, *supra*, 29 Cal.App.5th at 552.)

A similar scenario occurred in *Mike Davidov*, *supra*, 78 Cal.App.4th 597. There, after the trial court awarded compensatory damages, plaintiff requested and the court ordered the defendant to produce all records regarding its net worth the following day, prior to the punitive damages phase of trial. (*Id.* at p. 603.) The defendant did not bring the records. The plaintiff argued that the trial court could nevertheless award punitive damages by applying a multiplier to the compensatory damages award. (*Id.* at p. 604.) The trial court agreed and awarded the plaintiff $96,000 in punitive damages, approximately four times the compensatory damages. (*Ibid.*) On appeal, the defendant argued that the trial court erred by awarding punitive damages without any evidence of his financial condition. (*Id.* at p. 605.) The appellate court agreed with the defendant that the trial court "was incorrect when it concluded, as a matter of law, punitive damages can be awarded without any evidence of a defendant's wealth." (*Id.* at p. 610.) However, it concluded "affirmance is nevertheless proper because there was a valid basis upon which such an award was proper, that is, defendant's failure to obey a court order to produce his financial records." (*Ibid.*)

*Morgan* and *Mike Davidov* demonstrate that even if the trial court misunderstands or misapplies the law on punitive damages, a defendant's failure to comply with discovery obligations provides an independent basis for affirming the award. Thus, we need not decide whether the court erred in

29

instructing the jury as it did.[12]  The trial court expressly found
that appellants did not comply with their discovery obligations;
they did not bring any documents to trial despite "frequently"
receiving requests that they do so and evincing an understanding
of those requests.  "[F]or purpose of requiring attendance and the
production of documents at trial, a subpoena is equivalent to a
court order." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th
1308, 1338.)  Appellants' failure to obey the order deprived
respondent of the ability to meet her burden of proof; they may
not now be heard to complain.  (See *Mike Davidov*, *supra*, 78
Cal.App.4th at p. 609; see also *Garcia v. Myllyla* (2019) 40
Cal.App.5th 990, 995 (*Garcia*).)  "A defendant is in the best
position to know his or her financial condition, and cannot avoid
a punitive damage award by failing to cooperate with discovery
orders." (*Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942.)
Appellants' in propria persona status during trial did not exempt
them from complying with discovery obligations and orders.  (See
*Burnete v. La Casa Dana Apartments* (2007) 148 Cal.App.4th
1262, 1267.)

---

[12]     In addition to the substance of the jury instruction,
appellants contend the court erred by not admonishing the jury
"that by virtue of rereading this revised instruction in isolation,
the trial court did not regard that instruction as any more
important than the others, nor that it signaled Appellants'
entitlement to punitive damages."  We need not address this
point either, though we note it is not well taken because the court
expressly instructed the jury that "If I repeat any ideas or rules of
law during my instructions, that does not mean that these ideas
or rules are more important than the others.  In addition, the
order in which the instructions are given does not make any
difference."

Appellants contend their failure to bring documents is not determinative because they were present to testify during respondent's case in chief but were not asked any questions about their financial condition. They point to *Garcia, supra*, 40 Cal.App.5th 995, in which the defendant both failed to produce documents and appear at the punitive damages phase of trial. The court in *Garcia* observed, "Had [defendant] Myllyla been present to testify, Plaintiffs could have at least questioned him about his financial circumstances." (*Garcia, supra*, 40 Cal.App.5th at p. 998.) Appellants assert that respondent similarly should have questioned them here. Given appellants' failure to produce documents, however, any such examination would have been hampered and essentially unimpeachable. Respondent properly requested documents *six times*. Appellants' failure to comply with these repeated requests is not excused by their presence at trial.

Appellants also argue that *Morgan* is distinguishable because it was a court trial and "plaintiff's counsel shared with the court that one of the defendants owned a home and some vehicles." Here, appellants shared with the court and the jury through their testimony that Lyndsy was employed as a lawyer, that Christian "work[s] in healthcare, hospital administration," that they employed household help including an au pair and a "cleaning lady," and that the incident took place in the bathroom "of the house that we purchased," a house with sufficient space for respondent to have her own bedroom and bathroom despite the presence of three young children. The jury reasonably could conclude from this evidence that appellants' financial condition was such that the punitive damages awards were properly

31

calibrated.[13]  Appellants assert that their post-trial declarations demonstrate that they lack the ability to pay even the compensatory damages, but these declarations were not before the jury and are in tension with the evidence presented.

## II.    Verdict Form and Multiple Recovery

Appellants contend that the verdict form "caused an ambiguous and unenforceable verdict that is not supported by substantial evidence."  Specifically, they contend it allowed for multiple recovery by permitting the jury to award damages for each cause of action, all of which they argue were predicated on the same emotional distress.  We disagree.

The verdict form asked the jury to find either in favor of appellants or respondent and award damages in connection with each individual cause of action.  It was therefore a series of general verdicts.  (See Code Civ. Proc., § 624; *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347, fn. 7; *Chavez v. Keat* (1995) 34 Cal.App.4th 1406, 1409, fn. 1.)  "A general verdict implies a finding in favor of the prevailing party of every fact necessary to support that verdict."  (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 678.)  Similarly, "[w]here there is no special finding on an issue found by the jury, the jury's finding is tantamount to a general verdict, and all reasonable inferences will be drawn to support it."  (7 Witkin, Cal. Proc. Trial (6th ed. 2024) General Verdict, § 345.)

Appellants assert the verdict form is ambiguous because it "led to a multiple recovery for Respondent's emotional distress damages."  This assertion is itself somewhat ambiguous, as it can

---

[13]    In his closing argument, Christian also told the jury, "I'm willing to pay more. . . .  And if you say that I owe more, then, that's fine.  I can't do anything about that."

be construed to attack both the verdict form and the resultant verdict.  To the extent appellants seek to attack the verdict form and its failure to apportion or clarify the nature of respondent's damages, such a challenge is forfeited here.  "To preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages." (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158; see also *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346.)  Appellants did not submit a competing verdict form or request any special findings or a special verdict.  To the contrary, they affirmatively refused to review the verdict form respondent proposed, leading the trial court to expressly find that they waived any right to review the form.

To the extent appellants seek to challenge the verdict itself as ambiguous, they still should have objected.  "'If the verdict is ambiguous the party adversely affected should request a more formal and certain verdict.  Then, if the trial judge has any doubts on the subject, he [or she] may send the jury out, under proper instructions, to correct the informal or insufficient verdict.'" (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456.)  No timely objection was made here.  However, where, as here, there is no indication of gamesmanship, courts have permitted parties to object belatedly.  (*Id.* at p. 456, fn. 2.)  In this situation, it first "falls to 'the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.'" (*Id.* at p. 456.)  "Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation.  [Citations.]  If the

verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages." (*Id.* at p. 457.)

Here, the trial court interpreted the verdict in its order denying appellants' post-trial motions. The court stated that it was "able to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions and to interpret the award of damages in a manner that ensures that Plaintiff is not being doubly compensated for the same injuries." Appellants contend this explanation was inadequate because it "adopted Respondent's unsupported position that she suffered emotional distress by virtue of Mr. Rodgers' recording of her, and separately suffered distress as a result of Ms. Rodgers' failure to respond to her scream or text." They further assert that even if the trial court was correct, and the damages for constructive invasion of privacy and NIED can be reconciled, "it does not substantiate the separate verdicts for intentional infliction of emotional distress and hostile work environment." In examining these claims, we bear in mind the general principle that "[a] judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

"A well-established principle, applied both at law and in equity, is that a plaintiff is entitled to only a single recovery for a distinct harm suffered, and double or duplicative recovery for the same harm is prohibited." (*Renda v. Nevarez* (2014) 223 Cal.App.4th 1231, 1237.) "Regardless of the nature or number of legal theories advanced by the plaintiff, he [or she] is not entitled to more than a single recovery for each distinct item of

compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159.) "In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his [or her] damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Id.* at p. 1159.)

Appellants argue that the "verdict for each cause of action that awards damages, is for the *same* emotional distress," from "the one incident." The record supports the trial court's contrary conclusion. The court instructed the jury with a modified version of CACI No. 1820, listing several distinct "specific items of damages claimed" by respondent: "1. Past and future mental suffering; 2. Past and future anxiety; 3. Past and future humiliation; 4. Past and future emotional distress; and 5. Harm to reputation and loss of standing in the community." Appellants did not and do not object to this instruction, which sets out several different types of damages the jury reasonably could have found respondent to have suffered. Respondent's counsel also argued that respondent suffered damages from the filming itself, from her subsequent fear that Christian "was going to come into her room," and from "all of the silence and people calling her crazy," and continued to suffer ongoing discomfort, worry, and confusion. The jury reasonably could link these distinct damages to different causes of action. The evidence indisputably showed that Christian attempted to film respondent, loudly walked around outside her door, sent her a text saying "FU," and

disparaged her as "evil and cruel" in a document filed shortly before trial.[14]  The evidence also supported the jury's apparent inference that Lyndsy heard and ignored respondent's scream, and dismissed respondent's concerns in favor of protecting Christian.  These independent actions reasonably give rise to distinct damage awards.  Appellants have not affirmatively shown error regarding the verdict form or the trial court's interpretation thereof.

## III.  Sufficiency of the Evidence

Appellants contend that the jury verdicts for negligence as to Lyndsy, hostile work environment (FEHA) as to both appellants, and punitive damages award against Lyndsy are not supported by substantial evidence.  We disagree.

### A.  Negligence

"Negligent infliction of emotional distress is not an independent tort in California, but is regarded simply as the tort of negligence." (*Klein v. Children's Hospital Medical Center* (1996) 46 Cal.App.4th 889, 894.)  To recover under the theory, a plaintiff must prove duty, breach of that duty, causation, and damages.  (*Ibid.*)  Appellants contend that respondent "proffered zero evidence to establish any one of these elements, let alone substantial evidence."  "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and " 'substantial" proof of the essentials

---

[14]     In a trial brief regarding the FEHA sexual harassment claim, Christian asserted, "It could be argued that it's nothing short of **evil and cruel** for Ms. Matthes to put my family through 4 years of both criminal and civil court . . . ."  Respondent's counsel asked Christian about this assertion on cross-examination.

[that] the law requires in a particular case.'" (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1006.)

### 1. Duty

Appellants assert that the court prejudicially erred by instructing the jury to determine the legal question of duty. They further assert that respondent's NIED claim against Lyndsy "[s]eparately" fails "because she did not present substantial evidence to support a legal finding that Ms. Rodgers owed her a duty of care." For the reasons exhaustively discussed above, we reject these contentions.

### 2. Breach

Appellants argue that respondent "did not identify any breach of duty by Ms. Rodgers that caused her harm." They contend she instead established a lack of breach by testifying that Lyndsy was not involved in the filming, "was extremely worried and nervous," seemed "really concerned about the situation and wanted to know what's going on . . . [and] she was honest," and responded to respondent's concerns "appropriately."

The duty of care at issue was Lyndsy's failure to protect respondent after, not before or during the filming incident. The record contains substantial evidence from which the jury could have concluded that Lyndsy breached that duty. Contrary to appellants' assertion that Lyndsy's testimony "that she slept through the incident was effectively unchallenged," both Christian and respondent testified to the unusually loud nature of respondent's scream. Christian further testified that he thought Lyndsy would be waiting for him when he got into the house, and Lyndsy testified that she regularly woke up when she heard her infants were awake. A reasonable jury could conclude from this evidence that Lyndsy heard and ignored respondent's

scream rather than taking protective action.  Additionally, as the trial court found, there was substantial evidence from which the jury could have concluded that Lyndsy "took affirmative steps that were calculated to protect her husband rather than protect Plaintiff, such as failing to call the police, denying Mr. Rodgers's possible involvement, and providing plaintiff with Mr. Rodgers's cell phones."  The jury was entitled to weigh this evidence against the isolated excerpts of respondent's testimony appellants identify here.

Appellants suggest that various comments the trial court made during the hearing on their post-trial motions were also unsupported by substantial evidence.  However, "oral remarks or comments made by a trial court may not be used to attack a subsequently entered order or judgment."  (*Transport Insurance Company v. TIG Insurance Company* (2012) 202 Cal.App.4th 984, 1009.)

### 3.    Causation

Appellants argue that there is no evidence that any act or omission by Lyndsy proximately caused respondent's damages, because Lyndsy "was not involved in, nor did she ratify her husband's misconduct."  They characterize the harm respondent suffered as indivisible and dispute that she suffered distinct harm from Christian's recording and Lyndsy's subsequent failure to come to her aid.

The court instructed the jury that it had to find appellants' negligence "was a substantial factor in causing Christin Matthes' serious emotional distress."  It defined "substantial factor" by giving CACI No. 430, Causation: Substantial Factor.  That instruction provided that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have

contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.  Conduct is not a substantial factor in causing the harm if the same harm would have occurred without that conduct."  The record contained substantial evidence from which the jury could have concluded that Lyndsy's failure to protect or aid respondent was a substantial factor in the emotional distress she suffered.

Respondent testified that she "got really nervous" when she heard Christian enter the house after the incident.  She texted Lyndsy, whom respondent was "100 percent sure that she had wakened up," with the hope that Lyndsy would read the text and realize she needed help. Lyndsy did not respond, so respondent armed herself with a pen and remained awake and on alert for the remainder of the night.  The jury reasonably could conclude from this evidence that Lyndsy's failure to aid respondent was a substantial factor in causing her distress, particularly in light of Lyndsy's trial testimony that she was "in this too."

### B.     Hostile Work Environment (FEHA)

FEHA provides that an "employer" may not "harass an employee. . . or a person providing services pursuant to a contract" "because of" various attributes, including "sex, gender, gender identity, [and] gender expression."  (Gov. Code, § 12940, subd. (j)(1).)  It further provides that an entity "shall take all reasonable steps to prevent harassment from occurring," and that "[l]oss of tangible job benefits shall not be necessary in order to establish harassment."  (*Ibid.*)  The statute defines an "employer" for these purposes as "any person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract."  (Gov. Code,

§ 12940, subd. (j)(4)(A).) "[A]n employer is strictly liable for harassing conduct of its agents and supervisors." (*Beltran v. Hard Rock Hotel Licensing, Inc.* (2023) 97 Cal.App.5th 865, 877 (*Beltran*).) "FEHA is to be construed liberally to accomplish its purposes." (*Id.* at p. 878, citing Gov. Code, § 12993.)

The jury found both appellants liable for violating FEHA and awarded respondent $100,000 in damages from each. Appellants contend these verdicts cannot stand because "no evidence was introduced to show that Respondent was an employee of the Rodgers family" at the time of the incident. To the contrary, they contend, the evidence showed that respondent had resigned and planned to leave the following morning. We are not persuaded.

First, appellants do not challenge the court's instruction to the jury that "Defendants were Christin Matthes' employers pursuant to the Federal Regulations governing the au pair exchange program." "Absent some contrary indication in the record, we presume the jury follows its instructions." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803.) Second, the parties stipulated to the admission of their "Host Family and Au Pair Match Agreement," a 12-month contract signed in January 2017. FEHA protects persons "providing services pursuant to a contract," and the November 8, 2017 incident occurred well within the contract's 12-month term. Third, both appellants gave testimony from which it reasonably could be inferred that respondent was their employee at the time of the incident. When Lyndsy was asked if respondent "was still working for you" at the time of the incident, she expressly said, "Yes, she was still our au pair" and acknowledged that respondent was "still in the room that was provided to her in [the] home." Christian testified that

40

the children "were sort of her charge" on the night of the incident, and that he would have expected respondent to "ma[k]e sure they were safe" if she were afraid after the incident.

Appellants further contend that Lyndsy cannot be liable because there was no evidence that she subjected respondent to unwelcome sexual harassment, engaged in sex-based harassing conduct, engaged in severe or pervasive conduct, or altered the conditions of respondent's employment or created an abusive working environment. They also argue, as they must given the strictures of FEHA, that there was no evidence that Lyndsy "knew or should have known that Mr. Rodgers engaged in harassment and failed to take appropriate corrective action."

"'Sexual harassment consists of any unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. [Citation.] It usually arises in two contexts. "Quid pro quo" harassment conditions an employee's continued enjoyment of job benefits on submission to the harassment. "Hostile work environment" harassment has the purpose or effect of either interfering with the work performance of an employee, or creating an intimidating workplace.'" (*Beltran*, *supra*, 97 Cal.App.5th at p. 878.) An employee must prove "'severe or pervasive'" harassment. (*Ibid*.)

"Prior to 2019, this requirement was quite a high bar for plaintiffs to clear, even in the context of a motion for summary judgment. But [Government Code] section 12923, which went into effect on January 1, 2019, clarified existing law in numerous respects. One such clarification, codified in subdivision (b), stated that '[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably

41

interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment.' ([Gov. Code,] § 12923, subd. (b).)" (*Beltran*, *supra*, 97 Cal.App.5th at p. 878.) Government Code section 12923, subdivision (a) "also clarified that a hostile work environment exists 'when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being.'" (*Beltran*, *supra*, 97 Cal.App.5th at p. 878.) The jury was instructed with the up-to-date pattern instruction defining "severe and pervasive."

The shower filming incident here unquestionably "created an intimidating, hostile, or offensive work environment" for respondent, who testified that she did not believe Christian would have filmed her had she been male. The conduct plainly offended, humiliated, distressed, and intruded upon respondent, so as to disrupt her emotional tranquility in the workplace and undermine her personal sense of well-being. As previously discussed, the evidence supported an inference that Lyndsy heard respondent's scream—i.e., should have known of the harassment—yet failed to take immediate and appropriate corrective action. The absence of direct testimony to that effect does not assist appellants; the jury was entitled to disbelieve Lyndsy and credit other evidence about the nature of the scream.

### C. Punitive Damages

Appellants argue that because there is no evidence that Lyndsy was negligent or violated FEHA, she "is not subject to punitive damages and the judgment should be reversed." This argument fails. As previously discussed, substantial evidence

supported the jury's findings that Lyndsy was negligent and violated FEHA.

Appellants argue in the alternative that Lyndsy cannot be liable for punitive damages because "there is *no* evidence that Ms. Rodgers acted with malice, oppression, or fraud." They point to respondent's testimony that Lyndsy "was taking care of me and really helped me out while I was there," and reiterate that Lyndsy was not involved in the recording incident.

A plaintiff may recover punitive damages "[i]n an action for the breach of an obligation not arising from contact, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. . . ." (Civ. Code, § 3294, subd. (a).) In the context of punitive damages, malice "means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(2).) An employer who is "personally guilty" of malice may be liable for punitive damages. (Civ. Code, § 3294, subd. (b).)

Whether Lyndsy acted with malice, like many other issues in this case, largely comes down to whether she heard and ignored respondent's scream and text message. A reasonable jury could find it "despicable" and a "willful and conscious disregard of the rights or safety of others" for Lyndsy to ignore these pleas and leave respondent alone and fearful in her room. A reasonable jury likewise could find that Lyndsy's efforts to protect Christian evinced disregard for respondent's safety. As we have repeatedly explained, the evidence supported the inference that Lyndsy heard and ignored the scream. Appellants contend "[t]his simply is not true: there was no evidence

43

introduced to infer that Ms. Rodgers woke up in response to Respondent's scream, let alone intentionally ignored it." The choices of which evidence to credit and which inferences to draw belonged to the jury; it was the arbiter of the truth here, not appellants.

## IV. Damages

Appellants' final contentions relate to the damages awarded. They acknowledge that their arguments regarding the compensatory damages, which they assert constituted a multiple recovery, "relate closely to their arguments concerning errors in jury instruction and use of an ambiguous general verdict form." We agree and do not address those arguments again. For the reasons previously stated, we conclude that the compensatory damages do not constitute an impermissible multiple recovery.

Appellants also contend that the already-remitted punitive damages awards of $1,800,000 against Christian and $200,000 against Lyndsy are excessive under California law and the due process clause of the U.S. constitution. "The imposition of 'grossly excessive or arbitrary' awards is constitutionally prohibited, for due process entitles a tortfeasor to "'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'"" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 (*Simon*).) "[T]he constitutional 'guideposts' for reviewing courts are: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in

44

comparable cases.'" (*Id.* at p. 1172.)  We review the award de novo to determine if it is excessive.  (*Ibid.*)

The considerations under California law largely overlap these constitutional guideposts.  They include "(1) the *reprehensibility* of the acts of the defendant in light of the record as a whole; (2) the amount of *compensatory damages* awarded; and (3) the *wealth* of the particular defendant."  (*Boeken v. Philip Morris, Inc.* (2006) 127 Cal.App.4th 1640, 1689.)  We reverse as excessive only if the entire record, viewed in the light most favorable to the judgment, indicates that the punitive damages were awarded based on passion and prejudice.  (*Ibid.*)

Reprehensibility is the most important factor in determining whether a punitive damages award is excessive. (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419 (*State Farm*).)  The United States Supreme Court has instructed courts to determine the reprehensibility of a defendant's conduct by considering whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  (*Ibid.*)  A reviewing court must consider the totality of the circumstances when determining the reprehensibility of a defendant's conduct.  (*Ibid.*)

The totality of the circumstances here supports a finding that Christian engaged in highly reprehensible conduct.  He made repeated attempts to film respondent in the shower on her last night with the family.  The harm he caused was "physical" because it affected respondent's emotional and mental health.

45

(*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 713.) As appellants acknowledge, the recording "was intentional and evinced an indifference and disregard of [respondent's] sense of privacy." Respondent was financially vulnerable, beholden to appellants for room and board, and the incident, though isolated, involved repeated attempts at filming.

The totality of the circumstances also supports a finding that Lyndsy's conduct was reprehensible. It can be inferred that Lyndsy heard and ignored respondent's scream, evincing reckless disregard for her health and safety and causing her physical as opposed to economic harm. Respondent was financially vulnerable. The isolated nature of the conduct does not negate the other indicia of reprehensibility.

The next factor is the disparity between the punitive and compensatory damages awarded. For Christian, the ratio is $1,800,000 to $450,000, or 4-to-1. For Lyndsy, the ratio is $200,000 to $200,000, or 1-to-1. There is no bright-line ratio that a punitive damages award cannot exceed. (*State Farm*, *supra*, 538 U.S. at p. 425.) The precise award must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. (*State Farm*, *supra*, 538 U.S. at p. 425.) As a general rule, single-digit multipliers like those applied here "are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." (*Ibid.*) Here, we conclude the awards were appropriate. Christian's highly reprehensible, undisputed conduct supports the 4-to-1 ratio. Lyndsy's less culpable conduct, which was disputed, is appropriately subject to a lower 1-to-1 ratio. (See *id.* at p. 425 [suggesting that a ratio of 1-to-1 might be the federal constitutional maximum in a case involving relatively low

reprehensibility and a substantial award of noneconomic damages].)

The third federal guidepost is the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. However, neither side addresses this factor in its briefing. Instead, both focus on the third California factor, the wealth of the defendants. Citing the lack of evidence at trial and their post-trial declarations, appellants contend "they do not have the ability to pay the collective $2 million in punitive damages." Respondent contends that any disproportionality between appellants' wealth and the awards was caused by appellants' failure to produce their financial records.

"A reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." (*Adams*, *supra*, 54 Cal.3d at p. 110.) Our review indeed is hampered here. However, as discussed above, appellants bear responsibility for this infirmity. Appellants provide no guidance as to what level of punitive damages may be appropriate in light of their financial condition; they simply contend that the entire award must be vacated. Yet the record as a whole does not indicate that the punitive damages were improperly based on passion and prejudice. And it contains some evidence that appellants' financial condition was somewhat sound at the time of trial, including homeownership and professional earning capacity. Under the unusual circumstances presented here, we conclude the punitive damages awards were not excessive.

## DISPOSITION

The judgment and order denying appellants' motion for JNOV are affirmed.  The parties are to bear their own costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


ZUKIN, J.